# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| HANNAH MITTER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 13-cv-00841 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| COUNTY OF DUPAGE, as an indemnitor, ) | |
| DR. BLAIN CUSACK, DUPAGE COUNTY ) | |
| SHERIFF'S OFFICE, and JOHN ZARUBA, in ) | |
| his official capacity as DuPage County Sheriff, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Hannah Mitter worked as a registered nurse at the DuPage County Jail ("Jail") from 2001 until she was fired in 2011. At the time of her termination, Mitter, a Korean-American woman, was 60 years old and suffered from extreme sensitivity and allergic reactions to perfumes and other scented substances. She claims that she was fired not for performance-related reasons but because of her disability, national origin, sex, and age. She has sued her employer, Defendant DuPage County Sheriff's Office ("Sheriff's Office"), for the alleged discrimination pursuant to the American with Disabilities Act ("ADA"), 42 U.S.C. § 12112 *et seq*., and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e. In addition, Mitter seeks to hold accountable the Sheriff's Office and Defendant Blain Cusack, who worked as a dentist at the Jail, for alleged assault and intentional infliction of emotional distress. Before the Court is Defendants' motion for

summary judgment on all claims. For the reasons explained below, the motion is granted in part and denied in part.[1]

## BACKGROUND

Mitter was hired by the Sheriff's Office as a Floor Nurse at the Jail in 2001. (Def. R. 56.1 Stmt. ("Def. SOF") ¶ 3, Dkt. No. 107.) Mitter is Korean-American and was 60 years old when she was terminated by the Sheriff's Office in 2011. (Pl. R. 56.1 Stmt. ("Pl. SAF") ¶ 3, Dkt. No. 110.)

In 2002, Lisa Zegar became the Health Care Administrator for the Jail, a position which included responsibility for overseeing the health care of all inmates within the Jail. (Def. SOF ¶ 5.) Zeger did not have the authority to hire and fire employees—only the Sheriff had such authority. (*Id.* ¶ 6.) Zegar could, however, make recommendations to terminate employees. (*Id.* ¶ 7.) To make such a recommendation, Zegar would author a report to her direct supervisor, Don Knoll. (*Id.* ¶ 8.) The Sheriff's Office follows a progressive discipline policy for all employees. (Pl. SAF ¶ 39.)

While working for the Sheriff's Office, Mitter was recognized as employee of the month and employee of the year and was considered an experienced nurse. (*Id.* ¶¶ 2, 3.) Even so, Zegar ultimately decided to recommend that Mitter be terminated and wrote a memorandum to Knoll regarding concerns with Mitter's performance. (Def. SOF ¶ 10.) After Zegar made her recommendation, Sheriff John Zaruba decided to terminate Mitter. (*Id.* ¶ 12.)

Mitter was terminated on June 14, 2011. (*Id.* ¶ 14.) While discussing her termination, Knoll read to Mitter from a sheet of paper that Mitter did not see. (*Id.*) Mitter claims Knoll told her that she was being terminated for medication errors, untruthfulness, and swearing. (Pl. Resp. to Def. R. 56.1 Stmt. ("Pl. RSOF") ¶ 33, Dkt. No. 110.) But the supervisor of the nurses at the

---

[1] In their reply brief, Defendants also ask this Court to strike portions of Mitter's statement of facts and declaration. The Court declines to do so, as the disputed responses and statements have no material impact on the Court's ruling.

2

Sheriff's Office was surprised by Mitter's termination—no one had reported to her that Mitter swore or was untruthful. (Pl. SAF ¶ 29.)

Zegar did not witness any of the incidents that formed the basis of her recommendation that Mitter be discharged but instead accepted the reports of other staff members. (Def. SOF ¶ 49.) For example, Zegar received a complaint from a fellow nurse, Kathy Pava, that Mitter had yelled at and berated Pava in front of other staff members for being tardy. (Def. SOF ¶¶ 16, 35.) Zegar was also told that Mitter had belittled a new staff member during orientation and argued with a female officer. (*Id.* ¶ 34.) On one occasion, Mitter refused to assess an inmate due to the inmate's Breathalyzer test result and was accused of dishonesty in connection with it—the Sheriff's Office claims that Mitter knew that refusing to assess the inmate violated Jail policy, while Mitter denies as much. (*Id.* ¶ 40; Pl. RSOF ¶ 40.)

In addition, Zegar's memorandum to Knoll recited that Mitter had made six medication errors while employed with the Sheriff's Office. (Def. SOF ¶¶ 17–18, 25.) Medication errors are relatively common at the Jail and generally do not give rise to discipline. (*See* Pl. SAF ¶ 33; Def. SOF ¶ 31.) Aside from her ultimate termination, Mitter was not otherwise disciplined for her medication errors. (Def. SOF ¶ 29; Pl. RSOF ¶ 29.)

One time, after giving the wrong medication to an inmate, Mitter said "fuck," an incident witnessed by Deputy Strzelecki. (Def. SOF ¶ 19.) According to Zegar, a report of the incident indicated that the inmate became hysterical and began putting his fingers down his throat. (*Id.* ¶ 32.) Strzelecki requested that Mitter tell him what medications the inmate had ingested but Mitter refused, citing confidentiality concerns regarding violations of the Health Insurance Portability and Accountability Act. (*Id.* ¶ 21.) Zegar was not present for this incident and, although she claims to have been informed about it by deputies and through reports, she did not

speak to any of the individuals who were present for the incident or wrote the reports about it. (*Id.* ¶ 24; Pl. SAF ¶ 31.) Swearing is relatively common at the Jail. (Pl. SAF. ¶ 38.) Zegar was aware that on one occasion, another nurse, Elizabeth Currie, was disciplined for using profanity with a final written warning from the supervisor of the nurses. (Def. SOF ¶ 30.)

Although these instances are cited by the Sheriff's Office in explaining Mitter's termination, Mitter claims that she was actually terminated due to discrimination based on, among other things, her disability in the form of severe allergies. In 2008, Mitter began experiencing physical allergy symptoms that she believed were related to the use of "Christmas tree" air fresheners inside the Jail. (*Id.* ¶ 53.) In November 2008, after Mitter provided Zegar with a doctor's note, the air fresheners were no longer allowed to be sold in the Jail. (*Id.* ¶¶ 54–55.) A March 2009 memorandum from Knoll to Chief Scott Wulff indicated that Mitter had enumerated several items that aggravated her allergies in the workplace and that Mitter was told that the Sheriff's Office was concerned about her health and willing to make reasonable changes to enable her to perform her job duties. (*Id.* ¶¶ 56–57.) Mitter was tested for allergies in January 2010. (*Id.* ¶ 58.) A February 2011 letter from her doctor indicated that she was "highly sensitive to chemical vapor irritants such as bleach and volatile organic compounds (VOCs)," which are emitted by thousands of products. (*Id.*) Mitter then met with her supervisors to discuss her request to remove problematic allergens from her work area, but she was told that accommodations could not be made until she provided a note from her physician indicating what was causing her allergic reactions. (*Id.* ¶¶ 59–60.) It does not appear that any further action was taken to address Mitter's concerns regarding her allergies after this meeting. (Pl. SAF ¶ 21.)

According to Mitter, one of the main causes for her allergic reactions at work was the actions by a dentist at the Jail, Dr. Blaine Cusack, a contract employee. (Pl. SAF ¶ 9.) Zegar asked

Cusack to stop using fragrances, air fresheners, unapproved cleaning supplies, and natural products in the Jail because Mitter was allergic to them. (*Id.* ¶ 11.) Cusack, however, testified that he did not know Mitter had any problems with allergies and further that he was asked only to stop hanging fragrance-soaked gauze. (*Id.* ¶¶ 12–14.) Nonetheless, according to Mitter, Cusack purposefully sprayed cologne and other fragrances in the area in which she worked and left out other vapor-emitting substances (although she did not actually see him or anyone else do so). (Def. SOF ¶¶ 62–64, 66–68, 70–71.) In addition, Mitter claims that Cusack made sounds like "woo, woo, woo, woo" about her. (*Id.* ¶ 65.)

In further support of her claims that the Sheriff's Office discriminated against her, Mitter points to a number of employees who she believes were similarly situated to her in that they also made medication errors. (*Id.* ¶¶ 41, 43.) Mitter claims that these employees were treated differently than she because they were not Korean, disabled, or as old. (*Id.* ¶¶ 41, 46, 48.) As to one of those employees, Steve Obey, Mitter also claims he was treated differently because he is a male. (*Id.* ¶ 57.) Mitter does not know, however, whether any of the allegedly similarly-situated employees had engaged in conduct similar to that of which she was accused in Zegar's memorandum. (*Id.* ¶ 43.) For example, although Obey made two medical errors in two days, Mitter admits that Obey was never accused of saying "fuck, fuck, fuck" or anything similar after making a medication error and that she does not know whether he was ever accused of belittling a staff member or dishonesty. (*Id.* ¶¶ 37–39, 40.) According to Zegar, she was unaware of any other nurses who engaged in conduct similar to that for which she recommended Mitter's termination. (*Id.* ¶ 36.)

After her termination, Mitter filed a charge of discrimination with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission ("EEOC"), and she

eventually brought the present lawsuit here. In her suit, Mitter claims that the Sheriff's Office discriminated against her and failed to accommodate her disability, in violation of the ADA (Count I); discriminated against her based on her national origin and sex, in violation of Title VII (Counts II and III); and discriminated against her based on her age, in violation of the ADEA (Count IV). Mitter also asserts claims against the Sheriff's Office and Cusack under Illinois state law for assault (Count V) and intentional infliction of emotional distress (Count VI).[2]

## DISCUSSION

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Gross v. PPG Indus., Inc.,* 636 F.3d 884, 888 (7th Cir. 2011). In assessing whether the movant is entitled to summary judgment, all reasonable inferences from the evidence presented must be drawn in favor of the nonmoving party. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)). "The initial burden is on the moving party . . . to demonstrate that there is no material question of fact with respect to an essential element of the non-moving party's case." *Cody v. Harris,* 409 F.3d 853, 860 (7th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If the moving party meets this burden, the non-moving party must submit evidence that there is a genuine issue for trial." *Id.* "The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Delta Consulting Grp., Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009).

---

[2] Mitter also references "race" discrimination in her brief (*see, e.g.*, Pl. Opp'n at 7, Dkt. No. 109), but she did not allege discrimination on the basis of her race in her Amended Complaint. No claims for race discrimination have been raised in this suit and the Court considers any references to such claims as extraneous.

**I.     Discrimination Claims**

With respect to her various discrimination claims, Mitter may meet her burden of proof using either the "direct" or the "indirect" method. *See Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014); *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013) (in responding to a summary judgment motion, a plaintiff "must initially identify whether [she] is litigating [her] case under a 'direct' or an 'indirect' method of proof (or both)."). In her opposition brief, Mitter has indicated that she is litigating under both.

"Under the direct method, the plaintiff must produce either direct or circumstantial evidence that would permit a jury to infer that discrimination motivated an adverse employment action." *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). "Direct evidence is something close to an explicit admission by the employer that a particular decision was motivated by discrimination; this type of evidence is rare, but it 'uniquely reveals' the employer's intent to discriminate." *Id.* A plaintiff may also present a "convincing mosaic" of circumstantial evidence that would permit the same inference without such an admission. *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012). Circumstantial evidence relied upon for this purpose may include: "(1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly[-]situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Diaz*, 653 F.3d at 587.

In contrast, "[t]he term 'indirect method' refers to a particular way of using circumstantial evidence at the summary judgment stage." *Morgan*, 724 F.3d at 996. "Under the burden-shifting analysis, a plaintiff must first establish a *prima facie* case of discrimination by demonstrating that (1) she is a member of a protected class; (2) she met her employer's legitimate job expectations;

(3) she suffered an adverse employment action; and (4) similarly[-]situated employees outside of the protected class received more favorable treatment." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). "If the plaintiff establishes a *prima facie* case of discrimination, the burden then shifts to the employer to offer a non-discriminatory reason for the adverse employment action. If the employer does so, the burden shifts back to the plaintiff to submit evidence demonstrating that the employer's explanation is a pretext." *Id.* (internal citation omitted).

Following Mitter's lead, the Court will address her discrimination claims concurrently, analyzing whether she has presented evidence under either the direct or indirect method sufficient to create a genuine dispute of material fact as to any of the forms of discrimination she has alleged.

    **A.**    **Direct Method**

As an initial matter, Mitter does not point to any evidence—direct or circumstantial—relevant to establishing her claim for gender discrimination under the direct method. Thus, the only claims to be addressed by the Court under the direct method are Mitter's claims for national origin, disability, and age discrimination.

Mitter appears to argue that there is direct evidence of discrimination only as to her claims for disability and national origin discrimination. As direct evidence that the Sheriff's Office discriminated against her based on her disability, Mitter claims that Zegar was "so irritated with Mitter's disability that she told her to find a new job." (Pl. Opp'n at 8, Dkt. No. 109.) Mitter, however, does not cite any record evidence to support her assertion. Nor does she include her allegation about Zegar's statement or any supporting record evidence in her statement of additional facts.

8

In support of her national origin discrimination claim, Mitter claims direct evidence in the form of an officer's order for her to remove her jacket that said "Korea." (Pl. Opp'n at 8, Dkt. No. 109.) Here, Mitter does provide a record citation. But the citation references her responses to Defendants' statement of facts[3] and she again does not include her allegation in her statement of additional facts. She also does not cite any facts showing that the officer's request stemmed from animus towards her Korean origin. Nor does she explain how an officer—who is not alleged to have had any authority to terminate her—asking her to remove her jacket would be akin to an explicit admission by the Sheriff's Office that its decision to terminate her was motivated by discrimination. As the Seventh Circuit has repeatedly cautioned, "summary judgment is 'not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.'" *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)). It is Mitter's obligation to set forth the evidence she has to support her claims and to show that summary judgment is not warranted. Bald assertions, unsupported by proper citation or explanation, do not suffice. Mitter has not set forth direct evidence that the Sheriff's Office discriminated against her based on her disability or national origin.

As to Mitter's claim of age discrimination, Mitter cites only circumstantial evidence (the same circumstantial evidence cited in support of her claims of disability and national origin discrimination). Mitter contends that "similarly[-]situated non-Korean, non-disabled, employees under 40 years old were not terminated or even disciplined for making medication errors,

---

[3] This is not the proper way to present facts at summary judgment. Local Rule 56.1 states that a party opposing summary judgment must present any facts requiring the denial of summary judgment in its statement of additional facts. A response to the movant's statement of fact can only serve to dispute that fact.

swearing, or being untruthful." (Pl. Opp'n at 8, Dkt. No. 109.) Mitter admits, however, that she does not know whether any of the allegedly similarly-situated employees that she named actually engaged in conduct similar to that of which she was accused in Zegar's memorandum (*i.e.*, the conduct that the Sheriff's Office cites as the reason for her termination).

Mitter also asserts that the fact that she was replaced by a non-disabled, non-Korean, 20-year old person constitutes circumstantial evidence of discrimination. Her argument seems to be that because the Sheriff's Office did not find another 60-year old nurse of Korean origin with allergies to hire, it must have been discriminating against Mitter in firing her. Yet Mitter presents no facts suggesting that this assertion is true. Mitter further asserts that the Sheriff's Office failed to "engage[] in an interactive process to find a reasonable accommodation for [her disability]." (*Id*. at 9.) It is clear from the record, however, that the Sheriff's Office did attempt to engage in an interactive process with Mitter to accommodate her disability. For example, the Sheriff's Office stopped allowing the sale of the air fresheners that had caused Mitter's allergic reactions and engaged in discussions with Mitter regarding how to accommodate her allergies. (*See* Def. SOF ¶¶ 54-57.) The purported circumstantial evidence to the contrary is not enough to constitute a "convincing mosaic" from which a jury could reasonably infer that the Sheriff's Office essentially admitted to discriminating against Mitter. This is particularly true given that Mitter has admitted much of the conduct that the Sheriff's Office cites as reasons for her termination. (*See, e.g.*, Pl. RSOF ¶ 18 (admitting to making six medication errors), ¶ 19 (admitting to using profanity after giving an inmate the wrong medication), ¶ 40 (admitting to refusing to assess an inmate due to his breathalyzer result).)

Accordingly, Mitter has failed to set forth sufficient evidence of disability, national origin, gender, or age discrimination under the direct method.

B.  **Indirect Method**

Turning to the indirect method of proof, the Sheriff's Office does not dispute that Mitter is a member of the protected classes that she claims. Nor does it challenge that her discharge constitutes an adverse employment action. Thus, the only contested issues to be decided under the indirect method of proof are: (1) whether Mitter has demonstrated that she met the Sheriff Office's legitimate job expectations, (2) whether similarly-situated employees who were not members of her protected classes received more favorable treatment, and if so (3) whether Mitter has set forth evidence demonstrating that the non-discriminatory reasons for her termination cited by the Sheriff's Office are pretextual.

To support her argument that she met the legitimate job expectations of the Sheriff's Office, Mitter cites her positive performance evaluations and employee awards received in previous years. The Sheriff's Office argues that such evidence is not relevant to whether Mitter was meeting its expectations at the time she was terminated. Indeed, the Sheriff's Office is correct that the proper inquiry is whether Mitter was meeting the Sheriff's Office's expectations at the time of her termination. *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). The Sheriff's Office is incorrect, however, to suggest that past performance has no relevance to the analysis—a reasonable jury could infer that due to Mitter's past performance, it is unlikely she actually began to perform below expectations and therefore conclude that the Sheriff's Office's purported performance concerns were pretextual.

Similarly, a reasonable jury could infer that similarly-situated employees who were not members of protected classes were treated more favorably than Mitter. She admits much of the conduct cited by the Sheriff's Office as the reason for her termination and that she does not know

whether any allegedly similarly-situated employees had engaged in similar conduct. Nonetheless, as the Seventh Circuit has explained:

> The similarly-situated analysis calls for a flexible, common-sense examination of all relevant factors. Similarly situated employees must be directly comparable to the plaintiff in all material respects, but they need not be identical in every conceivable way. We are looking for comparators, not clone[s]. So long as the distinctions between the plaintiff and the proposed comparators are not so significant that they render the comparison effectively useless, the similarly-situated requirement is satisfied.

*Coleman*, 667 F.3d at 846. (internal quotation marks and citations omitted) (substitution in original). As the Sheriff's Office admits, Mitter has cited evidence that other nurses made medication errors and used profanity. A jury could reasonably conclude that those employees, despite not having committed ***all*** of the same conduct for which Mitter was supposedly terminated, are nonetheless similarly-situated to Mitter.

Mitter has thus established a *prima facie* case of discrimination under the indirect method. As the Sheriff's Office has offered a non-discriminatory reason for Mitter's termination, the next question, then, is whether Mitter has set forth evidence that those reasons are pretextual. To demonstrate pretext, Mitter must show that the Sheriff's Office's stated reasons for firing her (1) had no basis in fact, (2) did not actually motivate her termination, or (3) were not sufficient to motivate her termination. *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004). "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000).

In this case, Mitter asserts that pretext may be inferred from the shifting explanations offered for her termination. In particular, she claims that she was first given three reasons for her termination but additional reasons were added later. This is not sufficient, as "[s]hifting and

inconsistent explanations can provide a basis for a finding of pretext[,] [b]ut the explanations ***must actually be shifting and inconsistent*** to permit an inference of mendacity." *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003) (internal citation omitted) (emphasis added). Mitter does not claim that she was ever given *inconsistent* reasons for her termination but rather that she was initially given three reasons and then later provided further explanation. Moreover, Mitter has not offered any evidence from which a reasonable jury could infer that the Sheriff's Office (or any Sheriff's Office employee) had any ill-will towards persons of her national origin, age, or gender. Simply put, Mitter has set forth no evidence from which a reasonable jury could infer that the reasons supplied for her termination were a pretext to obscure the fact that she was actually terminated for being of Korean, female, or 60 years old.

As to disability discrimination, however, Mitter has made at least some showing. Although the Sheriff's Office appears to have attempted to accommodate her disability (such as by stopping the sale of Christmas tree air fresheners), it appears that doing so became much more difficult after Mitter provided them with a doctor's letter indicating that she was highly sensitive to chemical vapor irritants, which are emitted by thousands of products. And although the Sheriff's Office has set forth evidence of misconduct, Mitter disputes whether the misconduct actually warranted her termination. It is not for the Court at the summary judgment stage to make credibility determinations or to weigh the evidence. Based on the record, a reasonable jury might very well be convinced that the Sheriff's Office did make reasonable efforts to accommodate Mitter and that her termination was truly attributable to poor performance. On the other hand, a reasonable jury might also conclude that the Sheriff's Office became frustrated trying to accommodate Mitter and thus fabricated reasons to fire her. Accordingly, although Mitter has failed to set forth sufficient evidence of national origin, gender, or age discrimination under the

indirect method, she has established a genuine issue of material fact as to her disability discrimination claim. That claim survives.

## II. Failure to Accommodate

Mitter also contends that the Sheriff's Office violated the ADA by failing to accommodate her disability. The Sheriff's Office argues that this failure-to-accommodate claim should be rejected because Mitter failed to exhaust her administrative remedies before filing her claim. The Court agrees.

As the Seventh Circuit has repeatedly explained:

> [A] failure to accommodate claim is separate and distinct from a claim of discriminatory treatment under the ADA. In fact, the two types of claims are analyzed differently under the law. Therefore, they are not like or reasonably related to one another, and one cannot expect a failure to accommodate claim to develop from an investigation into a claim that an employee was terminated because of a disability.

*Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 898 (7th Cir. 1999) (internal citations omitted). Mitter did not include a claim that the Sheriff's Office failed to accommodate her disability in her charge of discrimination. (*See* Def. SOF Ex. 8, Dkt. No. 107-9.) The only arguable reference to accommodation is found in Mitter's claim of disability discrimination, which states: "My disability does not affect my ability to perform the essential duties of my job, with reasonable accommodations." (*Id*. at 3.) But Mitter's charge of discrimination does not go on to allege that the Sheriff's Office failed to accommodate her, nor does it allege any specific instances of the Sheriff's Office's failure to accommodate her. *See Fleszar v. Am. Med. Ass'n*, No. 09-cv-2247, 2010 WL 1005030, at *5-*6 (N.D. Ill. Mar. 11, 2010) (distinguishing case where plaintiff claimed that "she was required to perform tasks that should have been performed by her non-disabled, higher-grade coworker" from one where plaintiff did not use the words "failure to accommodate" but nonetheless alleged sufficient facts to exhaust her claim by including specific

instances of her employer's failure to accommodate her disability in her EEOC charge). In short, Mitter did not exhaust her claim that the Sheriff's Office failed to accommodate her disability and thus summary judgment in favor of the Sheriff's Office is warranted as to that claim.

III. State Law Claims

The Court next addresses Defendants' arguments for summary judgment as to Mitter's state law claims.[4] As an initial matter, the Court notes that Defendants have waived any argument that the claims must be dismissed under the Illinois Tort Immunity Act's limitations period by failing to raise it as an affirmative defense (*see* Def. Ans. to Am. Compl., Dkt. No. 45). *Walker v. Sheahan*, 526 F.3d 973, 979 (7th Cir. 2008) (finding that a statute of limitations defense under the Illinois Local Governmental and Governmental Employees Tort Immunity Act was waived when defendants failed to raise the defense in the pleadings and first put the plaintiff on notice of the defense at the summary judgment stage).

A. Assault

With respect to Mitter's assault claim, she has not shown that there is a genuine issue of material fact precluding summary judgment. In Illinois, assault is defined as "a reasonable apprehension of an imminent battery." *Rosenberg v. Packerland Packing Co.*, 370 N.E.2d 1235, 1238 (Ill. App. Ct. 1977). "Battery is defined as the willful touching of another person. The touching may be by the aggressor or a substance or force put in motion by the aggressor. An action for battery does not depend on the hostile intent of the defendant, but on the absence of the plaintiff's consent to the contact." *Pechan v. DynaPro, Inc.*, 622 N.E.2d 108, 117 (Ill. App. Ct. 1993) (internal citations omitted). "There may be trespass to the person and liability for the actual damage, without intention to commit it, but not an assault and battery." *Razor v. Kinsey*, 1894 WL

---

[4] As one of Mitter's federal law claims survives, the Court will not revisit its exercise of supplemental jurisdiction over her state law claims for assault and intentional infliction of emotional distress.

2723, at *5 (Ill. App. Ct. 1894). "[A]n individual should not be allowed to erect a glass cage around [herself] and announce that all physical contact with [her] will result in liability." *Pechan*, 622 N.E.2d at 118 (citing *McCracken v. Sloan*, 252 S.E.2d 250, 252 (N.C. Ct. App. 1979)).

Mitter has offered no evidence that Cusack sprayed or left out vapor-emitting substances with the intent that the emitted vapors would touch Mitter rather than for another purpose, such as to combat noxious odors. Although Cusack was told to stop using substances such as fragrances, air fresheners, and unapproved cleaning supplies in the Jail, there is no evidence that he was told the reason for the restriction related to Mitter's allergies. In fact, as Mitter herself points out, Cusack swore under oath that he did not know Mitter had allergy problems. (Pl. SAF ¶¶ 11, 13.) Mitter's statement of additional facts cites no evidence—either documents or witness testimony—suggesting that Cusack was lying about not knowing.

With no evidentiary basis from which to infer that Cusack knew about Mitter's allergies, a reasonable jury could not conclude that Cusack would have known that vapors could aggravate those allergies and thus could not reasonably find the Cusack released vapor-emitting substances with the intention of aggravating those allergies. For this reason, even viewing the record in the light most favorable to Mitter, she has not set forth sufficient evidence to survive summary judgment on her assault claim.

### B. Intentional Infliction of Emotional Distress

Finally, the Court considers Mitter's state law claim for intentional infliction of emotional distress. "To prove a cause of action for intentional infliction of emotional distress, [Mitter] must establish three elements: (1) extreme and outrageous conduct; (2) intent or knowledge by the actor that there is at least a high probability that his or her conduct would inflict severe emotional distress and reckless disregard of that probability; and (3) severe and emotional distress."

16

*Adams v. Sussman & Hertzberg, Ltd.*, 684 N.E.2d 935, 941 (Ill. App. Ct. 1997). "Extreme and outrageous conduct sufficient to create liability for intentional infliction of emotional distress is defined as conduct that exceeds all bounds of human decency and that is regarded as intolerable in a civilized community." *Id*. at 941. "The emotional distress required to support the cause of action must be so severe that no reasonable person could be expected to endure it." *Id*. at 942.

Mitter claims that Cusack "used odorous materials that Mitter was allergic to even after he signed the agreement to stop. He did this because he thought Mitter's reactions were funny." (Pl. Opp'n at 15, Dkt. No. 109.) However, Mitter does not provide a single citation to the record or her statement of additional facts to support her assertions. As the Court explained above in connection with her assault claim, Mitter also has adduced no evidence that Cusack knew about her allergies. As such, there is no evidentiary basis from which a reasonable jury could conclude that Cusack purposefully released or left out vapor-emitting substances intending to cause Mitter severe emotional distress or that he did so with a reckless disregard for the probability of causing her severe emotional distress. Nor has Mitter presented any legal authority for the proposition that releasing or leaving out vapor-emitting substances with the intent that some portion of the vapors would come into contact with someone constitutes "conduct that exceeds all bounds of human decency and that is regarded as intolerable in a civilized community." *Adams*, 684 N.E.2d at 941. Even assuming that Cusack did purposefully leave vapor-emitting substances out with the intent of annoying Mitter or provoking a comical reaction from her, but without knowing that doing so could cause her to suffer allergic reactions, that conduct (while perhaps unprofessional and juvenile) could not be considered by any reasonable jury to exceed all bounds of human decency.

Moreover, Mitter has failed to set forth any evidence that she actually suffered severe emotional distress. While she asserts in her brief that she suffered "extreme emotional distress that

17

she is still dealing with today," (Pl. Opp'n at 15, Dkt. No. 109.), Mitter does not support that claim with any citation to the record. Nowhere in her statement of additional facts does she cite evidence of severe emotional distress during her employment—let alone evidence that she suffered severe emotional distress specifically as a result of Cusack's conduct. Furthermore, there is not a single reference in her statement of additional facts to the emotional distress from which she claims still to suffer. While Mitter does not have to prove that the alleged conduct provoked a physical reaction or that the conduct required her to receive psychiatric treatment or other medical care, she still has to make *some* showing of severe emotional distress. *See Bristow v. Drake St. Inc.*, 41 F.3d 345, 349-50 (7th Cir. 1994). Mitter has not set forth any evidence as to the severity of the distress she allegedly suffered and, without such evidence, she cannot prove her claim. *Adams*, 684 N.E.2d at 942 (finding that "[t]here was no evidence to show the severity of the distress [the plaintiff] suffered, *i.e.,* that he was hospitalized, sought and received psychiatric treatment, or even was prescribed medication" and explaining that "[a]bsent proof that the emotional distress suffered by the plaintiff was so severe so as to exceed all bounds of human decency, the stringent test established for this tort has not been satisfied.").

Accordingly, Mitter has failed to establish a genuine issue of material fact as to her claim for intentional infliction of emotional distress.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. No. 105) is granted in part and denied in part. Summary judgment is granted in favor of Defendants on Mitter's claims for national origin, age, and gender discrimination, as well as her claim for failure to accommodate her disability. Defendants are also awarded summary judgment on Mitter's state law claims for assault and intentional infliction of emotional distress. Defendants' motion for

summary judgment is denied, however, as to Mitter's claim for disability discrimination. That claim may proceed to trial.

ENTERED:

Dated: January 24, 2016

_____
Andrea R. Wood
United States District Judge